# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Dobbey*, 2011 IL App (1st) 091518

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LESTER DOBBEY, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-1518 |
| Filed | August 19, 2011 |
| Rehearing denied | October 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed the summary dismissal of defendant's postconviction petition alleging that his appellate counsel was ineffective in failing to challenge the admission of the deceased victim's identification of defendant as the shooter and the admission of the testimony of a medical examiner who did not perform the autopsy on the victim. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-10872; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan Goldberg, and Beth Herndobler, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Justices Howse and Epstein concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant Lester Dobbey appeals from an order of the circuit court of Cook County summarily dismissing his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). On appeal, defendant contends that the circuit court erred in dismissing his petition because he set forth an ineffective assistance of counsel claim that had an arguable basis in law and in fact. For the following reasons, we affirm the decision of the circuit court of Cook County.

¶ 2                                  BACKGROUND

¶ 3    Defendant was charged with multiple counts of first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated battery for firing a rifle at three individuals, striking one and killing another. Following a jury trial, defendant was found guilty of the first degree murder of victim Dorsey Williams, attempted first degree murder and aggravated battery with a firearm of Michael Cole, and not guilty of attempted first degree murder of a third person, Terence Robinson. Defendant was sentenced to consecutive sentences of 45 years' imprisonment for first degree murder and 6 years' imprisonment for attempted first degree murder.

¶ 4    Prior to trial, defense counsel filed a motion to suppress his statement to the police, alleging that his statement was coerced when police officers refused to allow him to make a telephone call in order to hire an attorney until after he gave his statement. The trial court denied the motion.

¶ 5    Defense counsel then filed a motion *in limine* to bar the State from making reference to defendant's or any other witness's gang affiliation. The trial court denied the motion.

¶ 6    Numerous individuals testified at trial, including the deceased's mother, Cole, Robinson, a paramedic, a fingerprint expert, an assistant State's Attorney, and Chicago police officers. We recite here only the details relevant to the issue before us.

¶ 7        At trial, Cole, the victim of the attempted murder, testified that he had known defendant for most of his life and had gone to school with defendant's brother. Cole and defendant lived on the same block and saw one another daily for "most of his life." In February and March 2000, Cole was a member of the Gangster Disciples street gang. Defendant was a member of a rival street gang, the Mickey Cobras. Cole disliked defendant because they were in rival gangs.

¶ 8        On February 25, 2000, Cole was on 92nd Street and Cottage Grove, riding in a stolen van from which shots were fired at defendant. Cole was not charged in the incident. Toward the end of March 2000, Cole was on the corner of 92nd Street and Cottage Grove when defendant and two neighborhood boys pulled up next to him in a car. Defendant asked Cole why he was staring at him, and Cole answered that he was staring at him because he disliked him. Defendant said Cole should not tell him that and warned that one day their "paths would cross."

¶ 9        Cole was at his girlfriend's house at approximately 9 p.m. on March 31when his friend and fellow gang member, Terence Robinson, asked him to drive him home. Robinson got into the backseat of the car and fell asleep while he waited for Cole. Cole stayed with his girlfriend awhile longer. Eventually, Cole drove to 91st Street and Dauphin, where he saw defendant pass by in a car. Thereafter, Cole's uncle, Dorsey Williams, flagged down Cole's car and got inside. Williams rode in front. Robinson was still asleep in the backseat.

¶ 10        At approximately midnight, as Cole approached the intersection of 92nd Place and St. Lawrence Avenue, he heard five to six gunshots. Cole was struck in his upper right arm. Williams was struck in the chest and slumped onto Cole.

¶ 11        Cole looked over his shoulder and saw defendant standing on the corner firing a rifle. Cole had an unobstructed view of defendant for two to three seconds, from a distance of 15 to 20 feet. Cole also saw a black male with defendant, but was unable to identify him.

¶ 12        Robinson testified that he awoke to the gunshots but did not sit up. When Cole, who had been shot, could no longer drive, Robinson moved to the front seat, took the wheel, and drove to a gas station two or three minutes away. Robinson went into the gas station and asked the clerk to call an ambulance. When he came back outside, Cole was helping Williams out of the vehicle. Williams was unable to walk. Williams "regained consciousness" as Robinson approached, and Cole laid him on the ground. Robinson heard Williams say, "I can't believe I'm shot. I'm shot. I'm shot." Robinson then heard Dorsey exclaim at least two times that it was defendant who shot him. Paramedics arrived and transported Williams to the hospital, where he subsequently died.

¶ 13        At the gas station, Cole provided police officers with a description and approximate address for defendant. At the hospital, Cole again provided the same address and description to another detective. On April 1, 2000, while Cole was still hospitalized, he viewed a photo array and identified a photograph of defendant.

¶ 14        Defendant was arrested on April 2, 2000, and brought to the police station. Chicago police detective Martin Tully testified that he and Detective Krakauski met with defendant in an interview room at approximately 12:15 p.m. Detective Tully told defendant that they wanted to speak with him about the March 31 shooting of Williams and Cole. Defendant

initially told the detectives that he was at his girlfriend Simone's house at the time of the shooting. Defendant did not know Simone's last name or address. Detective Tully unsuccessfully attempted to find Simone. Defendant signed a consent to search form, giving officers permission to search his home.

¶ 15    On April 3, Cole identified defendant in a lineup. Thereafter, Assistant State's Attorney Blakey (ASA) and Detective Tully renewed their interrogation of defendant. Defendant made a statement, again telling them that he was with Simone at the time of the shooting but, according to Detective Tully, also stated that he did not like the ASA, that he was very tired and did not want to talk to the ASA any longer. The interrogation was terminated.

¶ 16    Detective Tully testified that, at about 9 a.m. on April 3, defendant knocked on the locked door to the interview room and asked to use the restroom. On the way, defendant told Detective Tully that he was not with Simone during the shooting after all, that he did not want her involved, and that he did not want the police to bother her family. He claimed he was with his friend Kenny Calhoun at the time of the shooting.

¶ 17    Detective William Higgins testified that later that day, defendant again knocked on the interview room door. When Detectives Higgins and Krakauski answered the door, defendant told them that he wanted to tell the truth about the homicide. Defendant stated that on March 31, 2000, he was near 92nd and Cottage Grove Avenue when he saw Cole drive past and point a gun at him. Defendant then obtained a rifle and went to 92nd Place and St. Lawrence Avenue. At approximately midnight, defendant again saw Cole driving nearby. Defendant fired 20 rounds from his rifle at Cole's car. Detective Higgins asked defendant where the rifle was now, and defendant initially stated that he threw it into a river. Defendant later stated that he left the rifle by a nearby garbage can. Police searched for the rifle, but did not recover a weapon.

¶ 18    ASA Eileen Austin Murphy testified that she met with defendant at the police station on April 3, 2000, and informed him of his *Miranda* rights. Defendant agreed to make a handwritten statement. ASA Murphy read the statement in court. In it, defendant stated that he previously was a member of the Mickey Cobra street gang and that Cole was a member of rival gang the Gangster Disciples. Defendant stated that, in February 2000, some Gangster Disciples shot at him from a van. Cole was in the van from which the shots were fired.

¶ 19    At approximately 10 p.m. on March 31, 2000, defendant was driving his car when another car pulled up on the passenger side of his car. Defendant looked over and saw Cole driving the car and aiming a gun at him. Defendant drove away, met with some friends, and smoked marijuana. Then he obtained a gun and walked to 92nd Place and St. Lawrence Avenue.

¶ 20    When defendant saw Cole driving on 92nd Place he shot at the car approximately 10 times. Defendant stated that he wanted to shoot Cole.

¶ 21    Dr. Kendall Crowns, a forensic pathologist at the Cook County medical examiner's office, testified as an expert in forensic pathology that he had reviewed the photographic slides and autopsy report performed by Dr. Filkins on the victim's body. At the time of trial, Dr. Filkins no longer worked for the medical examiner's office. Dr. Crowns testified that a bullet entered Williams' right chest and exited out of the mid-back. There was no evidence

-4-

of close-range firing. Dr. Crowns concluded to a reasonable degree of medical certainty that the cause of Williams' death was a gunshot wound to the chest and that the manner of death was homicide.

¶ 22 Defendant offered no evidence on his behalf. The jury returned a verdict of guilty of the first degree murder of Williams and the attempted first degree murder of Cole. He was found not guilty of the attempted first degree murder of Robinson.

¶ 23 On July 15, 2002, defense counsel filed a motion for new trial. However, defendant informed the trial court that he no longer wanted defense counsel to represent him because he felt defense counsel had provided "bad representation." Defendant then filed a *pro se* motion for a new trial. In August 2002, defense counsel was discharged.

¶ 24 After hearing arguments in October 2002, the court denied defendant's *pro se* motion for a new trial. Following arguments in aggravation and mitigation, the trial court sentenced defendant to consecutive sentences of 45 years' imprisonment for first degree murder and 6 years' imprisonment for attempted murder.

¶ 25 Defendant appealed, contending that: (1) the trial court erred by admitting gang evidence; (2) the prosecutor made improper remarks during opening statement and closing argument; (3) the trial court failed to conduct an adequate inquiry into defendant's allegations of ineffective assistance of counsel before denying his *pro se* motion for a new trial; (4) the trial court erred by failing to strictly comply with Illinois Supreme Court Rule 401 (eff. July 1, 1984) before allowing defendant to proceed *pro se* on his posttrial motions; and (5) his sentence was unconstitutional where the trial court imposed a sentence enhancement. *People v. Dobbey*, No. 1-02-3452 (2004) (unpublished order under Supreme Court Rule 23). This court found that: (1) the trial court did not err by admitting evidence of defendant's and Cole's gang affiliations; (2) the prosecutor erred in closing argument, but that the error did not require reversal due to the overwhelming evidence of defendant's guilt; and (3) defendant's sentence enhancement was proper. We also found that the trial court gave conflicting and sometimes incorrect admonishments regarding the possible sentence for first degree murder and the consecutive nature of the sentence for attempted murder. *People v. Dobbey*, No. 1-02-3452 (2004) (unpublished order under Supreme Court Rule 23). Accordingly, we vacated defendant's sentence and remanded the case for further posttrial proceedings. *People v. Dobbey*, No. 1-02-3452 (2004) (unpublished order under Supreme Court Rule 23).

¶ 26 Upon remand to the trial court, a public defender was appointed to represent defendant. However, defendant again chose to represent himself *pro se* in all posttrial matters. The trial court admonished defendant pursuant to Rule 401(a) and then granted his request. Defendant filed another *pro se* motion for a new trial raising 67 allegations of error. After a hearing on the motion, the trial court denied the motion for a new trial. The trial court again heard arguments in aggravation and mitigation and sentenced defendant to the same sentence as before.

¶ 27 Defendant appealed that ruling, contending that the trial court prematurely denied his *pro se* motion for a new trial alleging ineffective assistance of counsel without an evidentiary ruling. *People v. Dobbey*, No. 1-05-2800 (2008) (unpublished order under Supreme Court

Rule 23). We affirmed defendant's convictions and sentences. *People v. Dobbey*, No. 1-05-2800 (2008) (unpublished order under Supreme Court Rule 23).

¶ 28 Defendant then filed a *pro se* petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/5-1401 (West 2008)) for relief from judgment which was dismissed by the trial court. The office of the State Appellate Defender, who represented defendant on appeal, filed a motion for leave to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). This court found no issue of arguable merit, allowed counsel's motion, and affirmed the judgment of the trial court. *People v. Dobbey*, No. 1-08-0100 (2009) (unpublished order under Supreme Court Rule 23).

¶ 29 In February 2009, defendant filed a *pro se* petition for postconviction relief, alleging, in relevant part, that: (1) appellate counsel was ineffective for failing to raise the claim that trial counsel should have challenged the trial court allowing the decedent's excited utterance identifying defendant as the shooter; and (2) appellate counsel was ineffective for failing to challenge the trial court allowing the hearsay testimony of Dr. Crown as to the autopsy work of Dr. Filkins, who no longer worked for the Cook County medical examiner's office. The trial court summarily dismissed the petition as frivolous and patently without merit. Defendant filed a motion to reconsider that ruling, which the court denied.

¶ 30 Defendant appeals the summary dismissal of his postconviction petition, alleging only that appellate counsel was ineffective for failing to challenge the trial court's admission of: (1) the decedent's statement identifying defendant as the shooter; and (2) the testimony of a medical examiner who did not perform the autopsy on the victim. For the following reasons, we affirm.

¶ 31 ANALYSIS

¶ 32 I. Williams' Out-of-Court Statement

¶ 33 Defendant first contends that the trial court erred in summarily dismissing his postconviction petition where his trial counsel failed to provide effective assistance by failing to raise the claim that the admission, via Robinson's testimony, of the victim's statement identifying defendant as the shooter was erroneous. Specifically, defendant claims the statement was testimonial and violated his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006). We disagree.

¶ 34 The Post-Conviction Hearing Act provides a remedy for defendants whose constitutional rights were substantially violated in their original trial or sentencing hearing when such a claim was not, and could not have been, previously adjudicated. *People v. Enis*, 194 Ill. 2d 361, 375 (2000). An action for postconviction relief is a collateral attack upon a prior conviction and sentence, rather than a surrogate for a direct appeal. *People v. Tenner*, 206 Ill. 2d 381, 392 (2002).

¶ 35 The summary dismissal of a postconviction petition is appropriate at the first stage of postconviction review where the circuit court finds that it is frivolous and patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2008)), *i.e.*, the petition has no arguable basis in either law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). To have no arguable basis,

the petition must be based on an "indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. In order for a defendant to circumvent dismissal at the first stage, he must allege the "gist" of a constitutional claim, which is a low threshold. *Hodges*, 234 Ill. 2d at 9-10. This standard requires only that a defendant plead sufficient facts to assert an arguable constitutional claim. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). The summary dismissal of a postconviction petition is a legal question which we review *de novo*. *Hodges*, 234 Ill. 2d at 9; *People v. Edwards*, 197 Ill. 2d 239, 247 (2001). "Although the trial court's reasons for dismissing [the] petition may provide assistance to this court, we review the judgment, and not the reasons given for the judgment." *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 36    To establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *People v. Coulter*, 352 Ill. App. 3d 151, 157 (2004). Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994).

¶ 37    A court reviewing the summary dismissal of a postconviction petition which alleges the ineffective assistance of counsel must determine whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether it is arguable that defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17. This test applies equally to claims of ineffective assistance of appellate counsel. *Jones*, 399 Ill. App. 3d at 368. "Accordingly, '[a] defendant who contends that appellate counsel rendered ineffective assistance, *e.g.*, by failing to argue an issue, must show that the failure to raise the issue was objectively unreasonable and that, but for this failure, defendant's conviction or sentence would have been reversed.' " *Jones*, 399 Ill. App. 3d at 372 (quoting *People v. Griffin*, 178 Ill. 2d 65, 74 (1997)). Unless the underlying issue is meritorious, the defendant cannot show prejudice from the failure to raise it on appeal. *People v. Coleman*, 168 Ill. 2d 509, 523 (1995).

¶ 38    The statement with which we are concerned here is that of Terence Robinson wherein he stated at trial that he heard decedent Williams say that it was defendant who shot him. Robinson testified that he heard Williams say this at the gas station when Williams was laid out on the ground, just minutes after having been shot through the chest and having been in and out of consciousness. Williams' statement occurred just moments before paramedics arrived, finding Williams "having trouble breathing," "very sweaty," and "pale." His right lung was not functioning, and he had a good pulse but "no blood pressure." The paramedics further noted that Williams was "talking to us, able to give us his address, where he lived, his medical history." They had no trouble understanding what he said to them.

¶ 39    Immediately thereafter, Williams was transported to the hospital where he underwent surgery and died later that same day. An autopsy revealed that a bullet entered the right chest, penetrated the right chest cavity, continued through the lower lobe of the right lung, perforated and lacerated the liver, perforated the thoracic spine and exited out of Williams' mid-back.

¶ 40    The trial court admitted the statement in question as an excited utterance or spontaneous

declaration. Defendant does not argue the evidentiary-based merits of admitting the statement as an excited utterance, but instead focuses his argument on constitutional grounds, asserting that allowing the statement was error because the statement was testimonial. The State does not address the trial court's admittance of the statement as an excited utterance, either. Instead, the State counters that, although the trial court did not find and the State did not argue at trial that the statement should have been admitted as a dying declaration, the "record supports such a characterization." The State argues the merits of admitting the statement as a dying declaration, then argues that the statement was not testimonial under *Crawford*.

¶ 41　　Although from the outset defendant would have us review the propriety of the admission of this statement under confrontation clause principles, our supreme court has directed that, when reviewing the admissibility of out-of-court statements into evidence, we must first determine whether those statements " 'pass[ ] muster as an evidentiary matter.' " *People v. Melchor*, 226 Ill. 2d 24, 34 (2007) (quoting *In re E.H.*, 224 Ill. 2d 172, 179 (2006)). Only once the statements have been found admissible as an evidentiary matter may the appellate court consider " 'constitutional objections–including *Crawford*-based confrontation clause claims.' " *Melchor*, 226 Ill. 2d at 34 (quoting *In re E.H.*, 224 Ill. 2d at 179-80). The *Melchor* court, quoting its previous decision in *In re E.H.* stated:

> "We reasoned:
>
> > 'Only once the statement has first been found admissible as an evidentiary matter should constitutional objections–including *Crawford*-based confrontation clause claims–be dealt with. [Citations.] This is the only analytical 'flow chart' that comports with the rule that courts must avoid considering constitutional questions where the case can be decided on nonconstitutional grounds.' "
>
> *Melchor*, 226 Ill. 2d at 34 (quoting *In re E.H.*, 224 Ill. 2d at 179-80).

Accordingly, we first consider whether Robinson's testimony regarding decedent Williams' statement was properly admitted hearsay evidence. We find that it was.

¶ 42　　　　　　　　　　a. Statement Admitted as an Excited Utterance

¶ 43　　Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). Generally, hearsay statements are inadmissible, but the rule has certain exceptions. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). The trial court has discretion to determine whether statements are hearsay and, if so, whether admissible under an exception. *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2008). Thus, we will reverse a trial court's hearsay ruling only for an abuse of discretion. *Spicer*, 379 Ill. App. 3d at 449. An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 44　　Hearsay exists where a third party testifies to statements made to him by another nontestifying party that identify the accused as the perpetrator of a crime. *People v. Yancy*, 368 Ill. App. 3d 381, 384-85 (2005). A spontaneous declaration or excited utterance is a recognized exception in hearsay jurisprudence. *People v. Williams*, 193 Ill. 2d 306, 352 (2000). The rationale behind the rule is:

" 'The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.' " *People v. Damen*, 28 Ill. 2d 464, 471 (1963) (quoting *Keefe v. State*, 72 P.2d 425, 427 (Ariz. 1937)).

For a hearsay statement to be admissible under the excited utterance or spontaneous declaration exception, there must be: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the occurrence. *Williams*, 193 Ill. 2d at 352. To be admissible, then, a statement must be spontaneous, excited and unreflecting. To this end, courts consider the totality of the circumstances, including: the time elapsed between the event and the utterance, the nature of the event, the declarant's mental and physical condition, and the presence of self-interest. *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1012 (1999).

¶ 45        Here, Williams' statement identifying defendant as the shooter was made after he had been shot and mortally wounded, making him unavailable at trial. It was made following an incident in which defendant aimed a rifle at the car in which Williams was riding, shooting both the driver and a passenger. The injured driver was then unable to control the vehicle and Robinson, awakened from his nap in the backseat, had to take the wheel. Robinson drove the vehicle to a nearby gas station to call for help. This scenario is certainly "sufficiently startling to produce a spontaneous and unreflecting statement." The time which elapsed between the shooting and the statement was merely a matter of minutes; Williams made the statement just minutes after being shot, as he was lying on the ground experiencing the physical results of the gunshot through his chest, and before he had time to reflect upon the event. Moreover, Williams' statement occurred just moments before paramedics arrived, finding Williams "having trouble breathing," "very sweaty," and "pale." His right lung was not functioning, and he had a good pulse, but "no blood pressure" at all. Finally, the statement obviously related to the circumstances of the occurrence, as defendant was identifying to Robinson, who was asleep when the shooting occurred, who the shooter was. Appellate counsel was not ineffective here, where this statement falls within the hearsay exception.

¶ 46        We note that the State urges us to consider whether this statement should have been admitted as a dying declaration. We decline to do so. To qualify as a dying declaration, it must be shown that: (1) the declaration pertained to the cause or the circumstance of the homicide; (2) the declarant must have believed that death was imminent; and (3) the declarant must possess the mental faculties sufficient to give an accurate statement about the circumstances of the homicide. *People v. Hatchett*, 397 Ill. App. 3d 495, 502 (2009). A reviewing court can affirm the trial court on any basis supported by the record. *People v.*

*Durr*, 215 Ill. 2d 283, 296 (2005). However, because we have determined that the trial court properly admitted this statement as an excited utterance, an analysis of whether the statement would also have been properly admitted as a dying declaration would be redundant.

¶ 47                                          b. The *Crawford* Claim

¶ 48     We next consider whether the introduction of Williams' statement violated defendant's sixth amendment right to confrontation because that statement was testimonial and Williams did not testify at trial so as to be subject to cross-examination. We proceed to this constitutional *Crawford* challenge because we have already considered that statement in the evidentiary context and found that its admission was not erroneous. See *Melchor*, 226 Ill. 2d at 35 ("[o]nly if the trial court's *** ruling was not erroneous, or was erroneous but harmless as an evidentiary matter, should the appellate court turn to the constitutional challenge to the evidence"); see also *People v. Spicer*, 379 Ill. App. 3d at 449 ("Hearsay analysis and sixth amendment analysis are completely different. A statement may be admissible under hearsay rules but barred by the sixth amendment and vice versa.").

¶ 49     The confrontation clause of the sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend VI. This part of the sixth amendment applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007). In *Crawford*, the United States Supreme Court held that because the critical safeguard of the confrontation right is the opportunity to cross-examine the witnesses against the defendant, testimonial hearsay statements may be admitted into evidence against an accused only when: (1) the witness is unavailable to testify; and (2) the defendant had a prior opportunity to cross-examine the witness. *Stechly*, 225 Ill. 2d at 279 (citing *Crawford*, 541 U.S. at 53-54).

¶ 50     The *Crawford* Court declined to define what constitutes a "testimonial" statement, but offered some examples of what would constitute a testimonial statement: testimony at preliminary hearings, testimony before a grand jury or at a prior trial, in-court guilty plea statements of co-conspirators to show the existence of a conspiracy, and statements made during police questioning. *Crawford*, 541 U.S. at 68; *People v. Thompson*, 349 Ill. App. 3d 587, 594 (2004).

¶ 51     The Supreme Court further defined "testimonial" in *Davis*, 547 U.S. at 821-24, reiterating that the confrontation clause has no application to nontestimonial statements. See *Stechly*, 225 Ill. 2d at 279 (" 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the [c]onfrontation [c]lause.' " (Emphasis omitted.) (quoting *Davis*, 547 U.S. at 821)).

¶ 52     The *Davis* Court considered statements from two consolidated appeals, *Davis v. Washington* and *Hammon v. Indiana*, in which criminal defendants raised confrontation clause challenges to out-of-court statements which had been admitted at their trials. The first was an emergency call to a 911 operator, assumed to be an agent of law enforcement, and the second was made to police officers at the scene of a domestic altercation once the altercation

had ended. Ultimately, the Court determined that the statements to the officers at the scene of the domestic disturbance were testimonial, but the statements to the 911 operator were not. In making the distinction between the two statements, the Court explained that statements to law enforcement officials are not always testimonial. Instead, whether such statements were testimonial depended on the objective manifestations of intent of the police when taking the statement:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

¶ 53    Differentiating the 911 call from the police investigation of the domestic disturbance which had ended, the Court noted that a 911 call was not designed to establish or prove past facts, but to describe a circumstance requiring police assistance. In the 911 call, the caller related events as they were actually happening while facing an "ongoing emergency," rather than describing past events. The elicited statements were necessary to resolve the emergency rather than to investigate past events. *Davis*, 547 U.S. at 827. In the other situation, the victim's statements were made in response to an officer's questions in a room away from the defendant when there was no immediate threat to the victim. The purpose of the interrogation was investigatory: the statements recounted past events, they did precisely what a witness would do on direct examination, and they were inherently "testimonial." *Davis*, 547 U.S. at 830-31.

¶ 54    Interpreting *Crawford* and *Davis*, our supreme court in *Stechly* clarified the requisites of "testimonial," holding that a testimonial statement is one which: (1) is made in solemn fashion, and (2) is intended to establish a particular fact. *Stechly*, 225 Ill. 2d at 280 (citing *Crawford*, 541 U.S. at 51); see also *People v. Sutton*, 233 Ill. 2d 89, 111 (2009) (reaffirming the holding in *Stechly*). Only statements that are testimonial make the speaker a witness within the meaning of the confrontation clause. *Davis*, 547 U.S. at 821. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821. "[A] testimonial statement of a witness who does not testify at trial is never admissible unless (1) the witness is unavailable to testify, and (2) the defendant had a prior opportunity for cross-examination. [Citation.] Moreover, *** the confrontation clause has no application to nontestimonial statements. [Citations.] Thus, the threshold question in confrontation clause analysis is, Are the statements at issue 'testimonial'?" *Stechly*, 225 Ill. 2d at 279. Whether a statement is testimonial is a question of law, and our review is *de novo*. *Sutton*, 233 Ill. 2d at 112.

¶ 55    After the case before us was briefed, the United States Supreme Court decided *Michigan v. Bryant*, 562 U.S. at ___, 131 S. Ct. 1143 (2011), which examined the parameters of the "ongoing emergency" rule established by *Davis* (statements to police are nontestimonial when the "primary purpose of the interrogation" that produced them "is to enable police assistance to meet an ongoing emergency" (*Davis*, 547 U.S. at 822)). *Bryant*, 562 U.S. at

___, 131 S. Ct. at 1154-62. The Court in *Bryant* affirmed the primary-purpose approach to its post-*Crawford* confrontation jurisprudence. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1162. The *Bryant* Court considered whether statements made to police shortly after they arrived to assist a gunshot victim were testimonial, and held that *Davis* had directed courts to engage in a "primary purpose" inquiry to determine whether the primary purpose of the interrogation was to create a record for trial or was for some other purpose, such as responding to an ongoing emergency, in which case "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1155.

¶ 56    The facts of *Bryant* are similar to the case at bar. In response to a radio dispatch that a man had been shot, police arrived at the scene of a gas station to find the decedent lying on the ground next to his car with a gunshot wound to his abdomen. The decedent appeared to be in great pain and spoke with difficulty. Upon being asked by police what had happened, the decedent responded that the defendant had shot him approximately 25 minutes earlier outside the defendant's house. Police spoke to the decedent for about 5 to 10 minutes until emergency medical services arrived. The decedent was transported to the hospital, where he died within a few hours. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1150.

¶ 57    The *Bryant* Court considered the context of the interrogation and found that the statement was nontestimonial because the primary purpose of the statement was to respond to an ongoing emergency rather than with a future prosecution in mind. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1162-67. It determined there was an ongoing emergency because "an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the decedent] within a few blocks and a few minutes of the location where the police found [the decedent]." *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1164. It further found that a person in the position of the decedent who was mortally wounded, in considerable pain and had difficulty talking and breathing, "would [not] have had [the] 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1165 (quoting *Davis*, 547 U.S. at 822). It also found that the informality of the encounter, where the questioning "occurred in an exposed public area, prior to the arrival of emergency medical services, and in a disorganized fashion," would not have alerted the decedent "to or focused him on the possible future prosecutorial use of his statements." *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1166. Accordingly, the *Bryant* Court held that "the circumstances of the encounter as well as the statements and actions of [the decedent] and the police objectively indicate that 'the primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1166-67 (quoting *Davis*, 547 U.S. at 822). As such, the statement at issue was not testimonial and its admission at trial did not violate the confrontation clause. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1167.

¶ 58    After *Bryant*, then, to determine whether a particular statement is testimonial, the "relevant inquiry is 'the purpose that reasonable participants would have had' for their questions. [Citation.] 'When ... the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the [confrontation] [c]lause.' [Citation.]" *Graure v. United States*, 18 A.3d 743, 757

(D.C. 2011). Although the *Bryant* Court did not specifically address whether the confrontation inquiry for police interrogations applies equally to nonpolice interrogations or to situations such as the case at bar where spontaneous statements are made to nonpolice individuals, where such a similar statement under such similar circumstances was found to be nontestimonial when made in response to police questioning, we think it is also nontestimonial when made to a mere nonofficial individual. An objective evaluation of the circumstances in this case leads us to conclude that the comments made here, in the course of an ongoing emergency, were not testimonial.

¶ 59    We have found no Illinois cases directly on point to the case at bar. We have, however, found a recent case, *Graure v. United States*, 18 A.3d 743 (D.C. 2011), from the District of Columbia Court of Appeals which is strikingly similar to the instant case. While we are not bound by decisions issued by that court, we do find its reasoning instructive. In *Graure*, the defendant set fire to a strip club full of people. As people fled the club, an employee who was engulfed in flames during the fire and who later died of his injuries and, thus, was not available to testify at trial, identified defendant as the arsonist to two other employees. These out-of-court statements were admitted at trial as excited utterances. The court of appeals was asked, in relevant part, to determine whether the trial court erred in admitting these statements. The defendant argued that the statements were testimonial hearsay and that their admission violated his confrontation clause right to confront the witnesses against him. *Graure v. United States*, 18 A.3d at 754-55.

¶ 60    The court, relying on *Bryant*, found that the trial court did not err in admitting the statements where the statements were not testimonial. *Graure v. United States*, 18 A.3d at 756-58. It considered the *Bryant* factors and found that the primary purpose of the statements was to address an ongoing emergency. *Graure v. United States*, 18 A.3d at 757-58. The questioners were not police officers, but were managers of the club, neither of whom saw what had "caused the fire or whether whatever or (whoever) had caused the fire continued to pose a risk to workers and patrons or to the club premises." *Graure v. United States*, 18 A.3d at 757. Moreover, the court found that the injury to the declarant was caused by fire, "a weapon that could have continued to pose a threat to those in or near the club." *Graure v. United States*, 18 A.3d at 758. The scene was one of "confusion and bewilderment" and thus did not involve "formal or structured questioning." *Graure v. United States*, 18 A.3d at 758. Finally, the declarant's medical condition was grave, making it unlikely that the managers' questions would have " 'focused him on the possible future prosecutorial use of his statements' " and, thus, the statements were likely " 'simply reflexive.' " *Graure v. United States*, 18 A.3d at 758 (quoting *Bryant*, 562 U.S. at ___, ___, 131 S. Ct at 1162, 1166).

¶ 61    Turning now to the case before us, under all of the aforementioned precedent, we find that Williams' statement in the case at bar was not testimonial and, therefore, did not violate the confrontation clause. The primary purpose of the statement was to respond to an ongoing emergency rather than to create a record for trial. Moreover, the statement was not made in a solemn fashion.

¶ 62    First, like the declarant in *Bryant*, Williams made his statement in response to an ongoing emergency. He made the statement to Robinson who, although present during the shooting,

did not see the shooter. Although they had driven a few blocks from the scene of the shooting, it was certainly possible that the shooter could have followed them and still posed a threat to them or to others. The existence of an ongoing emergency is a "highly context-dependent inquiry." Bryant, 562 U.S. at ___, 131 S. Ct. at 1158. Here, we find that, like the shooter in *Bryant* and *Graure*, defendant could have caused further mayhem because he remained on the loose and armed immediately following the shooting.

¶ 63    Second, a person in Williams' position who was mortally wounded and in serious pain would not have contemplated future prosecution nor had as his primary purpose to establish or prove past events relevant to future prosecution. See *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1159.

¶ 64    Third, the informality of the encounter, like that in *Bryant* and *Graure*, shows that defendant would not have been alerted to the possible future prosecutorial use of his statements. The statements here were made in an exposed public gas station parking lot in the heat of emergency, prior to the arrival of emergency personnel, as the declarant was dragged from a vehicle after suffering a gunshot wound to the chest.

¶ 65    Fourth, Williams' statement was not made in the "solemn" fashion contemplated by *Stechly*, where the circumstances of the highly charged, ongoing emergency included Williams being pulled, mortally wounded, from the vehicle, passing from unconsciousness to consciousness, and telling his friend that defendant was the shooter. See *Stechly*, 225 Ill. 2d at 281-82 (to be testimonial, a statement must (1) be made in a solemn fashion; and (2) be intended to establish a particular fact). Here, the circumstances surrounding Williams' identification of defendant as the shooter were neither solemn nor do the objective circumstances indicate that a reasonable person in Williams' position would have been thinking about or anticipating a future prosecution. See *Stechly*, 225 Ill. 2d at 292 (the appropriate question in a testimonial analysis is "whether the objective circumstances indicate that a reasonable person in the declarant's position would have anticipated that his statement likely would be used in prosecution"). Rather, a reasonable person in Williams' position, reacting to an ongoing emergency, would have made the statement as a shocked response to having just been shot, or as a warning that defendant might shoot others.

¶ 66                                    c. Harmless Error

¶ 67    Even if the statement here were wrongly admitted, any error is harmless beyond a reasonable doubt. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005); *Stechly*, 225 Ill. 2d at 304 (*Crawford* violations are subject to harmless error analysis). In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Patterson*, 217 Ill. 2d at 428. Our supreme court has announced three different approaches for measuring harmless error in this context: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other evidence in the case to determine if overwhelming evidence supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Patterson*, 217 Ill. 2d at 428.

-14-

¶ 68    In the present case, defendant was convicted on evidence including his own confession, victim Cole's eyewitness and identification testimony, and the statement at issue here. On defendant's direct appeal, we found that the evidence against him was overwhelming:

> "Specifically, Cole testified to the shooting and identified defendant as the shooter, Robinson testified that both Cole and Williams identified defendant as the shooter, and defendant ultimately confessed to the shooting. In light of this overwhelming evidence, we find no cause for reversal." *People v. Dobbey*, No. 1-02-3452, slip order at 10 (2004) (unpublished order under Supreme Court Rule 23).

The admission of Williams' statement was brief and was not the crux of the State's case. In this respect and in light of the overwhelming proof of defendant's guilt, Williams' statement alone was not consequential to the jury's verdict of guilt.

¶ 69    In conclusion, Williams' statement identifying defendant as the shooter was properly admitted at trial. Moreover, the statement itself was not testimonial and, therefore, defendant's claim that his confrontation rights were violated by its admission is without merit. Thus, appellate counsel's failure to include the issue in defendant's appeal was not objectively unreasonable, and it could not have prejudiced defendant. Moreover, where the evidence against defendant was overwhelming even without Williams' statement, defendant is unable to show prejudice where, had appellate counsel raised the issue, his conviction would have not been reversed. See *Coleman*, 168 Ill. 2d at 523. Consequently, defendant has failed to establish that his claim has an arguable basis in fact or law. The summary dismissal of defendant's postconviction petition was proper.

¶ 70                    II. The Medical Examiner's Testimony

¶ 71    Next, defendant contends that his appellate counsel was ineffective for failing to raise the claim that the trial testimony of a medical examiner who had not conducted the autopsy violated his rights under the confrontation clause of the sixth amendment because defendant was unable to cross-examine the examining doctor. We disagree.

¶ 72    Dr. James Filkins performed the autopsy of the victim and produced an autopsy report. Dr. Filkins had left the employ of the medical examiner's office by the time of defendant's trial. Therefore, Dr. Crowns, a fellow in forensic pathology with the Cook County medical examiner's office, testified in defendant's case. In so doing, Dr. Crowns reviewed Dr. Filkins' autopsy report, and medical records from Christ Hospital where the victim was treated prior to his death, photographic slides that were taken of the victim's body at the time of the autopsy, and the toxicology report produced from fluids drawn from the victim's body at the time of the autopsy. From this review, Dr. Crowns was able to reach an opinion as to the cause and manner of the victim's death. Dr. Crowns testified accordingly, and the autopsy report was admitted into evidence.

¶ 73    A similar issue was recently decided by our supreme court in *People v. Williams*, 238 Ill. 2d 125 (2010), *cert. granted*, *Williams v. Illinois*, No. 108505 (June 28, 2011). Defendant acknowledges *Williams*, but argues that it was wrongly decided. In *Williams*, our supreme court rejected the defendant's claim that his sixth amendment rights were violated by the testimony of a forensic analyst who relied upon a DNA report prepared by a private

laboratory. *Williams*, 238 Ill. 2d at 150-51. The court noted, "it is well established that an expert may testify about the findings and conclusions of a nontestifying expert that he used in forming his opinions." *Williams*, 238 Ill. 2d at 143 (citing *People v. Lovejoy*, 235 Ill. 2d 97, 143 (2009)). The court concluded that the report was not hearsay because it was not offered for the truth of the matter asserted, but was to demonstrate what was relied upon in forming the expert's ultimate opinions.

¶ 74    Multiple divisions of the appellate court have previously held that testimony by a medical examiner regarding an autopsy report prepared by an individual who no longer works for the medical examiner's office is not testimonial and does not implicate the confrontation clause. *People v. Leach*, 405 Ill. App. 3d 297 (2010)[1]; *People v. Antonio*, 404 Ill. App. 3d 391 (2010); *People v. Pitchford*, 401 Ill. App. 3d 826 (2010); *People v. Moore*, 378 Ill. App. 3d 41 (2007). We see no reason to depart from this precedent. Accordingly, we hold that the medical examiner's testimony in the case at bar was properly admitted and defendant's confrontation rights were not violated.

¶ 75    After this case was briefed and oral arguments were held, the United States Supreme Court decided *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011). Defendant submitted a motion to cite this additional authority, which we granted. *Bullcoming*, however, does not change our analysis here. In *Bullcoming*, the defendant was found guilty of aggravated driving while under the influence of intoxicating liquor. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2709. On review, the Court, relying on *Melendez-Diaz v. Massachusetts*, 557 U.S. ___, 129 S. Ct. 2527 (2009), found that a certified blood-alcohol concentration (BAC) report which was prepared "solely for an 'evidentiary purpose' " and made in "aid of a police investigation" was testimonial. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2717 (quoting *Melendez-Diaz*, 557 U.S. at ___, 129 S. Ct. at 2532). Therefore, its admission into evidence required either live testimony from the analyst who performed the test and certified the report, or a finding that the analyst who performed the test was unavailable and the defendant had a prior opportunity to cross-examine that analyst. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2713. In *Bullcoming*, the "surrogate" testimony of another analyst who did not personally perform or observe the performance of the test was insufficient to satisfy the requirements of the confrontation clause. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2710.

¶ 76    The BAC report at issue in *Bullcoming* and the certificate of analysis at issue in *Melendez-Diaz* differ from the medical examiner's report at issue in the instant case. The BAC report in *Bullcoming* was created to prove the particular fact that the defendant's blood-alcohol content was above a certain limit. *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2710. The certificate of analysis at issue in *Melendez-Diaz* was also created to prove a particular fact, as it pertained to the results of a forensic analysis showing that material seized by police and connected to the defendant was cocaine. *Melendez-Diaz*, 557 U.S. ___, 129 S. Ct. 2532. As this court has previously found, autopsy reports are neither created for an evidentiary purpose nor created in aid of a police investigation. *Leach*, 405 Ill. App. 3d at 307-08.

---

[1]At the time of this opinion, *People v. Leach*, 405 Ill. App. 3d 297, *appeal allowed*, 239 Ill. 2d 572 (2011) (*Leach II*), is pending before our supreme court.

*Bullcoming* does not change our analysis regarding testimony by a medical examiner about an autopsy report prepared by an individual who no longer works for the medical examiner's office.

¶ 77 Defendant is unable to show prejudice where, had appellate counsel raised this issue, his conviction would not have been reversed. Consequently, defendant fails to establish that his claim has an arguable basis in fact or law. The summary dismissal of defendant's postconviction petition was proper.

¶ 78                                    III. Conclusion

¶ 79 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 80 Affirmed.